


**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **19-CR-571-VEC** |
| | ) | |
| JOHN LAMBERT (a.k.a. "ERIC POPE") | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

**AMICUS CURIAE SENTENCING MEMORANDUM**

Comes now "interested party" W. Penn Little, in response to the order of this court dated August 6th, 2020. I, W. Penn Little, indeed *am* an "interested party" and victim of actions for which the defendant in this matter has pleaded guilty. Also, upon information and belief, I am a victim of the actions perceivably negligently allowed by a corporation whose online platform was the one through which the defendant was able to defraud many victims. However, that entity Upwork Inc. ("Upwork") is not mentioned in the criminal complaint, this proceeding, nor have they been indicted as a co-defendant.

The U.S. attorney's office and the defendant have both chosen to jointly oppose my letter's requests. Therefore, in support of my previous request, I hereby **seek monetary restitution in the amount of $503,357.00** paid to various interested parties. In support I allege as follows:

**STATEMENT OF FACTS**

1. In late August 2017, I was in the midst of starting what would be my fourth business, while simultaneously closing the sale of my third business to a global private equity firm which operates in the very district this court presides.

2. On precisely August 19, 2017 I had an epiphany which allowed me to recognize that our business strategy in healthcare was, in reality, not a profitable business idea. This was due to economic foresight that has, of recent, proven to be an accurate prognostication.

3. Despite spending over $600,000.00 catalyzing that business; many other interested parties such as employees and those with financial interests (none anywhere close to mine) in the business: were objectionable. They didn't believe why I was choosing to back-out on various business acquisitions due to fear of an "economic bubble."

4. It was my goal to shift the focus of the business from a private equity style firm, to one which traded and mostly acquired "short" positions on publicly traded equity-of healthcare providers, and debt granted-to healthcare providers by banks.

5. The goal of the 'private equity' firm known as "Bar Nothin' Capital LLC" ("BNC"), a Delaware LLC, was to use leveraged buyouts to conglomerate quality centered behavioral healthcare provision.

6. The team recognized that if the funding parties which primarily included myself and Mr. Alexander Nichols ("Nichols"), were to consider their equity portion of contributions to the business purchases as private debt, then each of the members, including the eleven managers; would see immediate increases in net worth upon closing of the business purchases.

7. The information in paragraph six is unique because due to the socially impactful goal of the business; it was my hope that ownership of common units by the members and managers, as opposed to profit interests, would be beneficial. Therefore despite funding an overwhelming majority of the operation, I owned a mere 25% of the company.

8. This decision on my part backfired and by mid September the remaining members demanded an "audit" of the company's record. This audit, upon information and belief, was a tactic to stall my decision not to move forward with the purchase of companies that, in reality, placed each member and/or manager of Bar Nothin' in a precarious situation in which we could all be held liable for default on credit obligation that would one day be unable to be met.

9. Of course, I opposed this action, as it inhibited our ability to pivot the business effectively in time for the 3rd quarter earnings release of one company in particular.

10. In order to gain clarity surrounding the lawful way to move forward, I needed to consult an attorney but was unable to utilize the services of our company counsel which included the firms of Boies, Schiller and Flexner (Washington DC & New York) and Shartsis Freise (San Francisco).

11. Due to the hurdles described in paragraph 10, the short timeframe to seize imminent opportunity on the "short side," I needed and elected to seek counsel quickly to obtain an opinion letter that which I could send to my Bar Nothin' peers; in order to justify continuing operations due to the change of capital structuring (meaning we were going to consider capital expenditures toward operating Bar Nothin' in the pre-pivot phase as equity, and not debt).

12. The perceived counsel whom I selected was advertised by, and offered through: the 'Upwork.com' freelancer platform. He purported to be named Eric Pope, and seemed to be your typical "big law firm refugee" running a small shop in downtown Manhattan.

13. With money being held up in the suspension of operations, and the weekend upon us at the time, this was the best I would do for representation.

14. Upwork.com describes their platform from a marketing standpoint as:

> ***"Through Upwork, businesses get more done, connecting with proven professionals to work on projects from web and mobile app development to SEO, social media marketing, content writing, graphic design, admin help and thousands of other projects. Upwork makes it fast, simple, and cost-effective to find, hire, work with, and pay the best professionals anywhere, any time.***

15. The phrase "proven professional" does describe how I *perceived* the defendant during our interaction, however, it *does not* describe the Defendant's work product or credentials that were being falsely advertised on Upwork.com.

16. Upwork.com's terms of service states:

> ***"Upwork merely makes the Site and Site Services available to enable Freelancers and Clients to find and transact directly with each other. Upwork does not introduce Freelancers to Clients, find Projects for Freelancers, or find Freelancers for Clients. Through the Site and Site Services, Freelancers may be notified of Clients that may be seeking the services they offer, and Clients may be notified of Freelancers that may offer the services they seek; at all times, however, Users are responsible for evaluating and determining the suitability of any Project, Client or Freelancer on their own. If Users decide to enter into a Service Contract, the Service Contract is directly between the Users and Upwork is not a party to that Service Contract."***

17. The captions in ¶14 and ¶16 contradict each other.

18. Upon information and belief, after selecting the Defendant in this matter as my "counsel" I had an online chat as well as telephone call with the defendant (or someone associated with the defendant). The online chat is attached hereto as **"Exhibit A."**

19. The Defendant provided a letter as "work product," attached hereto as **"Exhibit B."**

20. The Defendant charged me, *and* I paid the Defendant a rate of $120.00 per hour (limiting work to a maximum of five hours). The defendant purported to spend four hours and billed $480.00, which I paid, personally, using a Chase Visa United MileagePlus credit card.

21. The Defendant's letter and accompanying "action without a meeting of the managers" **(Exhibit C)**, garnered a *majority* of the manager signatures, however, this was because I held the Defendant out as an attorney at law, and a majority of the partners trusted me (in the previous vote one, Mr. Tuberville had been admittedly unduly influenced by one member and the previous general counsel).

22. In reality, the letter was not up to par, accurate, nor was it clear. However, the defendant, *with conviction* might I add, exuded confidence to me and my affirming peers.

23. The attorneys for the company at both Shartsis Friese ("SF") and Boies Schiller Flexner ("BSF") accepted the letter as valid and affirming. Thus, they returned to work.

24. Over the next month or so, I began to rebuild the team around a bearish strategy and then in late October received a demand letter from a former partner, Alexander Nichols, wishing to recoup funds that he purported were a "loan."

25. The demand letter came after I vigorously fought to have our equity contributions memorialized, and believed "Pope" provided a work product sufficient to feel safe that Nichols

and my equity contributions were safely enshrined through our operating agreement (with the action letter included).

26. Under the assumption that Pope was a true lawyer, and his opinion letter and documentation were valid, I operated under the assumption that we could retain the same entity and safely function as a hedge fund manager.

27. Regarding my opinions in paragraph 26, our fund formation counsel, PaulHastings LLP disagreed with me. Then, it became unclear what precisely I would be receiving in exchange for all the money I had invested that led us to (what proves today to have been a good idea)[see **"Exhibit D"**].

28. Contradiction ran rampant and I was as confused as could be. Then the threat of a lawsuit from Nichols which appeared completely frivolous to the team and all our attorneys, ultimately led me to abandon the BNC entity for a new entity and exchange my release and withdrawal for shares in the new entity, which I required I offer Nichols the same. Nichols failed to respond to the offer.

29. Still operating under the flawed advice of the Defendant in this matter, I was recognizing a great deal of expenditures had been unnecessarily incurred for roughly 45-days, when in reality, a trained corporate attorney would have demanded we cessate as "BNC" immediately, and work to form a wholly separate entity.

30. By November of 2017 another demand letter surfaced, and on December 7, 2017 a lawsuit was filed by Nichols against BNC and myself, alleging fraud among other torts. The alleged fraud centered around lines 33-35 of the complaint which states:]

> ***"(33) In a September 28, 2017 email, Penn stated that the board's request for a spending freeze "was not in the best interest of the company" and***

> ***acknowledged that a "misunderstanding of capital accounts culminated in major misunderstandings." Penn then requested that each of the resigning members execute a Withdrawal, Resignation and General Release and return it to legal counsel at Shartsis Friese LLP. Penn's email also attached a letter from the New York Law Offices of "Pope and Dunn" dated September 19, 2017 (the "Pope and Dunn Letter") and an Action Without A Meeting of the Managers dated September 20, 2017 (the "Action Letter"). A true and correct copy of the Pope and Dunn Letter is attached as Exhibit A.***
>
> ***(34) The Action Letter attempted to memorialize capital contributions of various remaining members of BNC, including a newly formed entity, Great Day to Be an Eagle, LLC, owned predominantly by Penn along with three other members of BNC. The Pope and Dunn Letter purported to be written by an attorney named "Eric Pope" and explained that Penn's withdrawal of $472,000 in alleged capital contributions to BNC was authorized due to temporary suspension of the amended operating agreements restriction on such transactions. The Pope and Dunn Letter further requested that the board members agree to an "Additional Contributions" addendum to the amended operating agreement to recharacterize contributions of the members.***
>
> ***(36) On information and belief, Penn drafted the Action Letter and fabricated the Pope and Dunn Letter to manipulate and deceive BNC members, including Nichols, into retroactively approving his withdrawals of money from the BNC Account without authorization."***

31. Interrogatories filed by my personal counsel (See **"Exhibit E"**) demonstrate that I was unaware of Pope's true identity, however, knew that he was not licensed to practice law in New York. Beyond this, I was operating under the assumption that he was at least a lawyer, and (given the lack of rebuttal by our company counsel at first): the action and opinion documents held water.

32. In late May 2019, a call from a reporter who saw the complaint in the Nichols case, enlightened me that he first reported on May 9, 2019 (along with many other news media outlets that same day) that a suspect named John Lambert had been indicted for falsely assuming the name of "Eric Pope" and the alleged perpetrator was no lawyer at all. He was also *not* me.

33. The arguments surrounding the confusion prompted a lawyer who played the role as in-house counsel to use such chaos as an excuse to angrily confront the new BNCM team in an effort to leave a job in which, upon information and belief, she never intended in holding (long term). Then she sought to appeal lost wages in a lawsuit that also alleged fraud, simply piggybacking off of the Nichols opportunity which seeks to exploit my prior criminal conviction for personal financial gain.

34. This, upon information and belief, led to a third "chain reaction" or "pile-on" lawsuit by a third employee that did not work-out, and frivolously still seeks to recoup funds.

35. The "fraud" claim caused a whirlwind of speculation that I was "up to old tricks" which made very little sense. In reality, in the ten years since such conviction (which is inadmissible in court anyway due to FRE 609(C)(1), beyond the extent I wish to discuss it) I have:

- *Completed my Bachelor of Arts at the University of Oklahoma*

- *Completed my Master of Business Administration at the University of Arizona (Eller College of Management)*

- *Started and sold three successful businesses, the first of which earned me enough to satisfy restitution fully, which I did in March 2016 (See **"Exhibit F"**).*

- *Co-founded a suicide prevention and awareness organization in North Central Illinois.*

- *Founded a scholarship program for underprivileged students to attend my alma mater, The University of Oklahoma.*

- *Exposed a massive fraud at a major public company as a journalist and accurately predicted the fallout that would materialize in the form of covid-19 aftermath.*

- *Completed an Ironman triathlon and qualified for 4 USAT National Championships in the sport*

- *Had a report published by the U.K. Parliamentary Joint Committee on Human Rights which contributed to their final report on seclusion of autistic children in the U.K.; which ultimately aided in their planned liberation of over 2,000 children inhumanely secluded or locked up by (many U.S.-based) companies funded by the NHS solely for profit or (in the case of non profits) heads in beds.*

36. Nonetheless, Mr. Nichols (Nichols v. BNC et al), Mrs. Dittman (AIFOT LLC vs. BNC et al), and Mrs. Nunez (Keelan Consulting LLC v. BNC et al)(the three former employees turned 'partners' who ultimately filed suit) all (upon information and belief) believed that claiming fraud could prompt a quick "payday" when in reality none of these parties did much work, at all. For the work they *did*, they were well compensated.

37. In the case of Ms. Dittman, she gained a default judgment on December 19th, 2020, all due to the attorney's missed court date while I was coming back from London after exposing extreme injustices abroad surrounding the aforementioned autistic children.

38. Ultimately, the litigation costs stemming from the misrepresentation and collateral damage bred from ***the poor work product*** has eclipsed the $300,000.00 USD point to date (provided in **"Confidential Attachment Appendix"**)

39. The perceived failure to investigate and *indict* Upwork.com by the United States Attorney's office, upon information and belief, led to the failure to recognize the harm enacted

upon *all victims* in this matter. Furthermore, it is my belief this prosecution came as a result of Mr. Lambert's political activism during the 2016 election, and not the crime for which the defendant has accepted full responsibility.

40. In fact, the reporter who queried me regarding my interactions with the Defendant was more concerned with if the "accomplice" was in fact Mr. Ryan Fournier, the defendant's former colleague in the "Students for Trump" organization.

41. The entity that BNCM ultimately was to become, never was, and this is largely a combination of the aggressive strategy which scrutinized equity and credit obligations of healthcare providers. In fact, since the day one of the *only major* instances in which a public company was in fact indicted for a major crime (U.S. Senator/present-U.S. Vice Presidential candidate, Kamala Harris of California's administration, while serving as state Attorney General, indicted American Addiction Centers for murder)--healthcare companies, upon information and beleif, have been artificially inflated by banks[1].

42. The consequence of the aggressive strategy and strong team, as well as our attention drawing investors to a very serious issue, was a great risk for big banks financing these "zombie" companies.[2] Therefore, certain banks heavily invested in one company (the heart of our focus), Acadia Healthcare's success that they used my prior conviction as a way to manipulate "Know Your Customer Anti Money Laundering" systems to prohibit us from ultimately calling-in our raised capital, and launching. This was proven by a whistleblower who came forward from Bank of America Merrill Lynch in the Spring of 2018.

---

[1] https://seekingalpha.com/article/4254766-is-u-s-healthcare-crisis-long-overdue

[2] https://www.forbes.com/sites/forbesfinancecouncil/2018/10/17/from-zombie-corps-to-questionable-revenue-trends-to-watch-for-as-a-health-care-investor/#96816c853b86

43. No doubt the pile-on lawsuits and fraud claims (largely spurred by Lambert's actions) were a contributing factor to that failure to operate. As a result, the team, myself, and the general partners were left with monumental losses we are still seeking to recoup, and hope to soon in a Bivens claim which should be filed in the next 90-days.

44. Once I started to uncover the true nature of fraud at Acadia, I penned a February 2018 letter to the U.S. attorney general, and over fifty letters to regulators and federal law enforcement agencies as well. This includes FBI, SEC, and DOD investigative agencies. This spanned from their apparent insider trading schemes to a full executive directed cultivation of an environment embodied by "violent fraud." This is when executives dictate individual providers to cut costs in order to raise margins in a healthcare environment. This has led to many mysterious deaths and a missing mother of two and teacher in Tucson (Elizabeth Breck), as well as countless sexual assaults.

45. Following letters to regulators going out, I began to write and hoped to expose the industry perils and did so in a four part series in Forbes, and has led to a side career in which I have written over fifty edited and reputably published investigative articles. My report to the Arizona AG's office regarding the Elizabeth Breck disappearance is a prime example of a great deal of work in hopes of provoking a federal investigation into her disappearance. However, as much as I believe politics primed *this* prosecution--politics has assisted Acadia in avoiding it[3].

**SUMMARY OF ARGUMENT**

It is my belief that this court should consider four very important facts in this case.

---

[3]https://medium.com/@plittle/dark-side-of-mitt-romneys-success-9fc42341e7e1?source=friends_link&sk=45119e3e474ea36c333cc1cb25f98d46

The first is restitution and that the clear harm done has sat in the back seat to what I perceive as a *true focus* of this prosecution. Thus, my perception of the focus allowed me to recognize this proceeding as alarming for the reason that it is largely politically motivated.

In my opinion, as opposed to being focused on the interests of American citizens and safety of the commonwealth, it is focused on connecting those who err to the President of the United States. On the contrary, when I was subjected to a similar situation, at a similar age as the Defendant, the focus was on the victims (largely companies) who needed to be repaid.

The second is that "collateral damage" from the actions of a Defendant who has pleaded guilty should not ever be overlooked.

The third is that the failure (for the large part) of the Department of Justice to prosecute executives and Corporations is allowing a double standard to impede the interests of justice.

Finally, much consideration should be given to the fact that today the internet has committed theft of the concept of forgiveness in the world, and even more so in America. I have been affected by this and the Defendant undoubtedly has as well.

As for the allegations by the government that I have not provided sufficient evidence--what I have attached hereto, in addition to the article attached to my letter[4], is obviously more than sufficient. That published June 5, 2019 article echoes my concerns with "what really matters" in this case, and what I as a *victim* see as important.

**ARGUMENT**

[4] https://seekingalpha.com/article/4268379-inside-story-prompts-question-upwork-upside

## I. Restitution & Focus of Prosecution

The government penned an opposition letter to my request to be included as a victim which was accompanied with a prayer for leniency. In this instance it was jointly *opposed* by the Defendant. I'm shocked as to why a Defendant's counsel would oppose a prayer for leniency in any circumstance.

Nonetheless, as I work to draft this brief, I am constantly reminded this is ***not my job***. It should have been that of the U.S. attorney's office, to thoroughly investigate the Upwork platform. If that had been done, no doubt I would have been called. Even a meager five-hundred dollars of legal work that's subpar and drafted in false pretense--can cause a chain reaction. Such is the case in this matter.

## II. "Collateral Damage"

To best understand how myself, and my team were harmed in this regard, let's recall September 11th. A recent BBC article states, "In 2018, the president of the UFA told the BBC that roughly one in eight firefighters who were at Ground Zero had since come down with cancer."[5]

The aforementioned individuals stricken with cancer as a result of their valor in the workplace two decades ago, is causing early deaths. The agony of that is not comparable, however, easily relatable. I believe to this day, I am facing tremendous stress due to the

---

[5] https://www.bbc.com/news/world-us-canada-51634771

Defendants actions, and continuously mounting costs. It is still not quantifiable fully how much money, to the very penny, the Defendants actions has borne cost upon myself *and* my firms.

The government and probation office, in my opinion, should have taken a more active approach. Nonetheless, it appears to me that the political undertones have weakened the ability of our own law enforcement agencies to give attention to the cases that *actually matter.*

It is my belief I was intentionally ignored due to my calls for attention to bigger more important and imminent harmful practices it is astonishing to me that the prosecutors in this matter have not pursued an in depth victim-impact inventory.

The work of a lawyer, or lack thereof, can make or break a business. Therefore, the collateral damage should be weighed, and particular attention should be given to work products produced by the Defendant as opposed to the transactions. The harmfully poor work product and lack of insight by the Defendant could have placed, and likely has placed many *more* entities at risk.

## III. Failure to Prosecute Upwork, Inc.

Without taking a political side, the Financial Times' criticism[6] of Jessie Eisinger's book: "The Chickenshit Club: Why The Justice Department Fails To Prosecute Executives," suggests that,

> ***"Eisinger offers no happy ending. Corporate crime is not among Trump's priorities. Under attorney-general Jeff Sessions, the justice department is focused on violent street crime and immigration offences. Jay Clayton, the new head of the SEC, emphasises capital markets reforms."***

[6] https://www.ft.com/content/102ffa00-5bf4-11e7-9bc8-8055f264aa8b

It would appear to me that *if* a U.S. Attorney's office wishes to place a (warranted) check and balance on the executive branch--then pursuing 'Corporate Crime,' and politicking proactivity as opposed to stagnation. However, then again, I believe this prosecutorial effort ignored such a duty which is critical for such agencies to perform.

Had Upwork been prosecuted in this matter, and thus, the more *structured* medium held safeguards consistent with its marketing promises mentioned in ¶ 14, this matter could have been wholly avoided. However, Upwork did not politically support any candidate in 2016, as far as I know; and Eisinger appears spot on, to the detriment of the common public's safety.

**IV. Theft of Forgiveness**

Gleaning from my own personal experience, I believe that "paying the bill" was the most impactful consequence upon my future success. Also the internet has been the greatest hindrance to many potential successes due to the never ending tag of "felon" plastered all over the internet and left unshaken as much as the footsteps of the twelve different men that once explored the lunar surface.

In addition to this the federal government's combattance to this is largely ignored and has been hindered due to the fact the only avenue to "expungement" (aside from minor drug crimes) is operating in what I believe to be an *unconstitutional* forum. Moreover, the media scrutiny this young man has faced will be met with another round *if* a prison sentence is included. That could be very undue for him, and would inhibit his ability to make money. However, 18 U.S. Code § 3663A clearly lines out many different avenues for victims to seek remuneration and to gain

the proper closure necessary to move forward, and forgive. Perhaps using a more "outside the box" version of "3663A" would be a practical approach in this matter.

For instance, it is clearly voiced that "working-off" debts is an avenue to satisfying restitution and I would be open to allowing Lambert to take-on certain roles and work responsibilities in exchange for partial restitution. Additionally 3663A's section (C)3(B) states,

> ***"determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."***

In this matter that section would seem relevant, as $480.00 in fees is only the tip of the iceberg, and not an amount I'm primarily concerned with. My primary concern surrounds Lambert's future as a young man, his ability to make a comeback--and **myself, and my stakeholders getting paid.**

As for the unconstitutional forum such as that which a state level government could afford Mr. Lambert, if he is rehabilitated, would give the second chance to Lambert needed to overcome this media onslaught (which already came in two waves). In my experience, a response from the Pardon Attorney denying my request for constitutional expedience (in order to operate our company in 2018 when thwarted by banks), showed we were being denied a constitutional avenue. This *is* provided by law and not enforced. This is evidenced through Federalist 74, a paper that is part of a group in which the founding fathers presented reasoning for inclusion of particular constitutional content. Justice O'Connor once claimed that "the founders were so clear in the federalist papers."

The inclusion of Article II, Section II was a Federalist party proposal. The federalist motivation (supported by bi-partisan ratification) as described in a document penned by federalist leaders (whom personally included this concept) is clearly not being followed and hasn't been for a very long time.

Federalist 74 argues that

***"Humanity and good policy conspire to dictate, that the benign prerogative of pardoning should be as little as possible fettered or embarrassed. The criminal code of every country partakes so much of necessary severity, that without an easy access to exceptions in favor of unfortunate guilt, justice would wear a countenance too sanguinary and cruel."***

Furthermore, "74" states that,

***"it may be inferred that a single man would be most ready to attend to the force of those motives which might please for a mitigation of the rigor of the law, and at least apt to yield to considerations which were calculated to shelter a fit to objective of its vengeance."***

When discussing the concept's obstruction by congress, "74' argues that as opposed to what, upon information and belief, is fear of the process being colored by partisanship or bureaucracy that,

***"this ought the rather to be the case, as the supposition of the connivance of the Chief Magistrate ought not to be entirely excluded. But there are also strong objections to such a plan. It is not to be doubted, that a single man of prudence and good sense is better fitted, in delicate conjunctures, to balance the motives which may plead for and against the remission of the punishment, then any numerous body whatsoever."***

**CONCLUSION**

The Federalist 74 argument leads me to conclude. A sentence that is not constructed thoughtfully, focused on the crime, and met with objectivity would, indeed, bear in my mind *a*

*"countenance too sanguinary and cruel."* As for restitution, I hope I have demonstrated to the *court* the money is owed. I request the defendant settle the three lawsuits mentioned herein, and accept responsibility on the record--(so as not to place the tarnish of any such settlement, let alone a judgment on my, or my colleagues' records) in these (what I categorize as) frivolous lawsuits. The Keelan Lawsuit Plaintiff requests the amount of $43,352.00 USD, which we ask is ordered to be paid by the Defendant. The Nichols lawsuit requests $100,000.00 USD which we ask is ordered to be paid by the Defendant. And the AIFOT lawsuit requests $16,455.00, **which we ask is ordered to be paid by the Defendant**. Additionally I/we (the company) seek restitution for legal fees, paid to three law firms, in the amount of **$143,550.00**. I/we also seek an additional **$200,000.00** paid to the members of Bar Nothin' Capital Management (at the time it last operated, to be distributed to said members equitably and proportionately). **Again, The total monetary restitution sought is $503,357.00.**

I am also open to having Mr. Lambert ``work it off," in part, in a constructive setting in which he could likely learn a great deal and serve to satisfy all victims more expediently and efficiently. Additionally, the legal fees associated with defending myself and our company defending itself in those matters is proper. However, I will trust the court, probation office, and financial litigation office to (hopefully) serve me as any victim should be served.

September 11, 2020

Chicago, Illinois

Respectfully Submitted,

s/Williamson Penn Little
*Interested Party, Victim*
One South Wacker Drive
Chicago, Illinois 60606
(312) 854-7557
Fax: (312) 276-8767
p@pennlittle.com